[Crim. No. 317. Fifth Dist. May 16, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. SAMUEL JUNIOR ASTA, Defendant and Appellant.

Belli, Ashe, Gerry & Ellison for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

GARGANO, J.—Appellant was indicted by the grand jury of Sacramento County and ultimately convicted after jury trial of six counts of extortion in violation of section 518 of the Penal Code and one count of attempted extortion in violation of section 524 of the Penal Code. He appeals from the judgment of conviction.

Appellant operated a service in Sacramento County known as a fidelity shopping service which was offered to merchants in order to ascertain whether their employees were embezzling. Under this service appellant or members of his staff would make purchases at the client's store posing as casual shoppers and would observe the conduct of the client's employees. Suspicious activity would then be reported to the client, and if it appeared that an employee had been embezzling, he would be interrogated by appellant in the presence of the client. The interrogation was conducted pursuant to a provision of the service agreement which read as follows:

"In addition to the consideration set forth in the first paragraph hereof, you are authorized to interrogate on our behalf, any presently employed or past employed personnel in connection with violations of cash procedures, misappropriated funds and/or merchandise, and to take whatever action you deem necessary to recover same. Further, we authorize you to retain 50% of all funds and/or of the cash value of all merchandise recovered by your efforts."

Appellant does not challenge the sufficiency of the evidence in connection with counts 2, 3, 5 and 7. Thus, a brief resume of the facts as to these counts is sufficient. In each instance appellant, during the interrogation of an employee under investigation, accused the employee of theft and threatened him with criminal prosecution, jail, and loss of reputation; ultimately appellant secured a confession and the repayment of money. Moreover, in each instance the payment of money was an arbitrary sum set by appellant, and it was usually greater than the amount which the employee admitted stealing. Payment of this money was extracted from the employee with the promise that he would remain free if he reformed and made restitution.

The specific facts with respect to counts 1, 4 and 6, when viewed in the light most favorable to the respondent, are substantially as follows:

*Count 1—Attempted Extortion—Billy Hilton*

Mr. Rancourt, the owner of the Carmichael Honda Company of Sacramento, contacted the District Attorney of

Sacramento County in July 1965, with the complaint that he was experiencing shortages of funds at his place of business. After explaining what they had in mind, the members of the district attorney's staff requested him to contact appellant and act as if he were an employer whose employees were embezzling funds from him. In the meantime the district attorney's office contacted Billy Hilton, one of Mr. Rancourt's employees, and requested him to act as if he were stealing from his employer. Hilton was instructed to act frightened and to appear guilty during any interrogation by appellant. He was also instructed to admit that he had stolen money after a certain amount of interrogation.

On July 21, 1965, Mr. Rancourt contacted the appellant by telephone and made arrangements to hire him. On July 30 he was informed by appellant that Billy Hilton was stealing and an interview was suggested. At that time he told Mr. Rancourt not to say anything during the interrogation, but to just sit there and answer yes or no, and implied that Mr. Rancourt should answer in the affirmative.

Hilton was interviewed by appellant on July 31 in the presence of Mr. Rancourt. During the interview appellant accused him of stealing from his employer and pointed out that he would go to jail for such thefts. When Hilton proclaimed his innocence the appellant, among other things, stated that he was giving Hilton an opportunity to pay the money back; that he would have to pay it back anyway should he be lucky enough to get probation; that Mr. Rancourt had been losing $1,000 a month; that he could turn these thefts over to the bonding company, which would then calculate the amount owed and the employee would then have to pay back that amount; that Hilton would never get a job of responsibility the rest of his life; that he would be thrown in jail; that he had been investigating Hilton for many months; that he knew everything about him and his family and how he spent his money; and that if he (Hilton) lied appellant would call the district attorney's office and "within the hour you will be in jail, mugged, fingerprinted and booked." Finally, when Hilton admitted stealing $8 or $9 a day, appellant informed him that he calculated that the employee had stolen at least $4,762, and that this was the amount he had to pay. Appellant then dictated a confession, in which Hilton admitted the thefts in that amount. Thereafter, he informed Hilton that the amount had to be paid within 24 hours; otherwise, the bonding company would be notified, and he advised

Hilton not to contact a lawyer as such action would merely cost him money and would result in public exposure of his misdeeds. Appellant even went so far as to suggest that the employee's wife should be called to a meeting so that she could be convinced of the thefts committed by her husband.

### Count 4—Extortion—Jackson Barry Stevens

Jackson Barry Stevens was employed by the Kid-E-Korral as a shoe salesman and was interviewed by appellant on March 12, 1965. Appellant told him that he (Stevens) had taken money, and that appellant had cash register tapes which allegedly proved this theft. Stevens then asked appellant how much he supposedly had stolen, and appellant calculated the amount but Stevens replied that it was not nearly that much. Appellant replied, ''All right, we'll go to the District Attorney's office.'' Stevens said, ''Oh, no, I can't stand that amount.'' However, appellant promised to handle the problem confidentially and Stevens finally said, ''O.K. if it won't go any further I'll pay the $600.'' Appellant dictated the confession which Stevens wrote out, and subsequently Stevens paid the $600. Stevens testified during appellant's trial that he had not embezzled or misappropriated funds from his employer, and that he paid appellant because he wished to avoid publicity and because of his fear that he would never get another job as a shoe salesman.

### Count 6—Extortion—Edward R. Thomas

Edward R. Thomas, who was employed at Lawrence's Department Store, was interviewed by appellant and accused of stealing on February 13, 1965. After Thomas admitted that he had $240 in the bank which he had taken from the store, appellant said that they would call the police and that law enforcement people would take care of the case. Appellant picked up the phone and began dialing a number and told Thomas that he would get hold of the district attorney's office ''unless you want to confess.'' Thomas urged that he not call the authorities, however, and appellant began to figure out how much money Thomas had taken. He came up with a total of $3,000. It was also mentioned that Thomas had stolen some clothing so the amount was upped to a total of $3,356. Appellant then dictated a confession and Thomas wrote and signed it. After the confession was signed, appellant called Thomas's father, Mr. Robert H. Thomas, and asked him to come to the store. Upon Robert Thomas's arrival he was confronted with his son's confession. The father stated he was unable to pay

that amount whereupon the appellant said: "It means—it could mean San Quentin." Robert Thomas obtained $3,000 from his brother, but before paying this amount to appellant he asked whether the payment would insure that his son would not be prosecuted. Appellant replied that it did so far as he was concerned.

## Appellant's Contentions

Appellant presents four main contentions for reversal: that during the trial errors in law occurred which resulted in a miscarriage of justice; that there was insufficient evidence to justify the verdicts of the jury on counts 1, 4 and 6; that the trial court erred in giving and refusing to give certain instructions to the jury; and that the prosecutor was guilty of prejudicial misconduct.

## I—Errors

We will deal first with the alleged errors. These errors are (1) that the trial court erred in admitting evidence of alleged offenses not charged in the indictment, (2) that the trial court erred in excluding evidence of appellant's true *modus operandi*, and (3) that the trial court erred in refusing to allow appellant to call two members of the district attorney's office as witnesses with the guarantee that appellant would be permitted to cross-examine and impeach said witnesses.

1. Appellant concedes that under proper circumstances evidence of other crimes is admissible in a criminal prosecution. He apparently asserts, however, that the court erred in allowing into evidence testimony relating to six incidents not included in any of the offenses charged in the indictment. In this connection, he argues that these incidents did not show that he had committed other acts of extortion, but at worst indicated that he had been rude to persons suspected of stealing from their employers. Thus, he concludes that the evidence degraded him in the eyes of the jury and should not have been admitted. Respondent, on the other hand, contends that the crimes of extortion with which appellant was charged and for which he was convicted were predicated on his threatening his victims with criminal prosecution if they failed to pay the arbitrary amounts which he designated, and that the six incidents of which appellant complains showed that this method of operation was employed on numerous other occasions.

It is well established, requiring no citation of authority, that evidence of other crimes is not admissible to prove that

the accused is disposed to commit crime. Such evidence, although arguably relevant, is highly prejudicial and would tend to lead to convictions simply because the jury believes that the accused is an evil person. It does not follow, however, that all evidence which reveals the commission of other crimes is inadmissible. Hence, it is also settled that evidence of other crimes offered to prove a relevant or material fact (other than the accused is predisposed to commit crime) is admissible. As stated by the California Supreme Court in *People* v. *Lopez,* 60 Cal.2d 223, 249-250 [32 Cal.Rptr. 424, 384 P.2d 16] (cert. den. 375 U.S. 994 [11 L.Ed.2d 480, 84 S.Ct. 634]) : ▇ " 'It is settled in this state . . . that except when it shows merely criminal disposition (*People* v. *Cook* (1905) 148 Cal. 334, 340 [83 P. 43] ; *People* v. *Glass* (1910) 158 Cal. 650, 658 [112 P. 281], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. ▇ "The general tests of the admissibility of evidence in a criminal case are : . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." ' (*People* v. *Peete* (1946) 28 Cal.2d 306, 314-315 [169 P.2d 924].)"

▇ Accordingly, it has been held in specific regard to the crime of extortion that evidence which shows or tends to show other acts of extortion or attempted extortion is admissible to show the defendant's "criminal methods and purposes" (*People* v. *Tarantino,* 45 Cal.2d 590, 598 [290 P.2d 505]), and to show intent and common scheme or plan (*People* v. *Francisco,* 112 Cal.App. 442 [297 P. 34]). Thus, we will review each incident with these principles in mind.

### Incident One

James E. Gibson, who was employed at the Kid-E-Korral, testified that on March 12, 1962, his employer introduced him to appellant who told him he was in serious trouble in that he had been stealing from the store. Appellant told him that if he cooperated he would be allowed to go home free, but if not they would take him to the district attorney's office and file charges against him. Appellant also told him that he was very fortunate that he was being allowed to make restitution, in lieu of being turned over to the district attorney, and that if he would cooperate he could "go home free." Appellant

designated the sum of $10,000 as the amount which Gibson had stolen, and when Gibson objected that he had not taken that much he was told that he must either cooperate or be turned over to the district attorney. Appellant then dictated a confession to Gibson and ordered him to write it out and sign it. Gibson further testified that he signed the confession and ultimately paid the full amount of the $10,000 because he was terrified at the thought of being turned over to the district attorney's office. He testified, however, that he had not taken more than $3,000 from his employer.

### Incident Two

Allen Chamberlain, the manager of Value Village (a store located in Sacramento), described appellant's interrogation of Dolores Martinez, an employee of the Village. He testified that during the course of the interrogation appellant accused the employee of stealing, which she at first denied; that finally she admitted that she had taken a few dollars for lunch; that appellant warned her that if he did not get the truth he was going to call the proper authorities; that he then asked her if she wanted him to notify the authorities or if, instead, she preferred to tell the truth; that he further warned her that if she lied to him once more he was going to turn her over to the authorities; that appellant picked up the phone as if to call the authorities, at which time she said, "Please, no don't call"; that when the employee told the same story about taking money for lunch appellant again picked up the phone, dialed a number and told the person on the other end that an employee at the market had been caught stealing and asked "that they come over and pick her up"; that after that the employee promised to tell the truth "if the police did not come"; appellant again telephoned and this time said, "it would not be necessary for them to come for the employee"; that after the employee admitted taking $5 a day for a period of six months appellant had her write a confession in which he specified the amount to be inserted; that after that the employee made out a check in the amount of $600, payable to Value Village.

### Incident Three

Helen Collingwood, a former employee of appellant, testified concerning appellant's interrogation of a Chinese clerk in February 1964. She stated that appellant accused the clerk of theft, which he vehemently denied. After this appellant told the clerk that he would call the sheriff, and that the clerk

would be sent to jail for stealing as appellant had more than adequate evidence to establish the crime. In spite of his threats the employee refused to admit criminal activity. The appellant then contacted his secretary and dictated a confession for her to type. When the employee refused to sign the confession appellant threatened that if he did not sign it he would go to jail, and that the sheriff would be called immediately. The employee still persisted in his claim of innocence and refused to sign the confession.

### Incidents Four and Five

John Robert Moore, a former partner of appellant, told of how the appellant had interrogated an employee of the L & L Liquor Store in 1963. The representations made by appellant at that time were that the employee had been "shopped" on numerous occasions, and that violations had been traced to him. When the employee refused to admit any criminal activity the appellant advised him that he had committed a theft and was subject to prosecution. The employee continued to deny his guilt and refused to sign a confession. However, he did write a check for $120 and gave it to the appellant. Moore also testified that he was present during the interrogation of two boys who worked at the Alpine Bowling Alley. The two boys had been caught stealing. The first of the two boys refused to admit that he had taken money, but when it was indicated that if he did not confess the sheriff's office would be called, he admitted a theft of about $160 and signed a confession to this effect.

### Incident Six

Norris Rancourt, the owner of the Carmichael Honda Company, who had engaged appellant at the district attorney's request, testified that on the afternoon of July 30, 1965, appellant interviewed one of his employees, Dan Middendorff. Appellant informed this employee that he was sure that the employee had not rung up a sale correctly, and attempted to ascertain if the employee had stolen the property. When the employee denied that he had stolen any property the appellant went to the telephone and said that he was going to call either the district attorney or the sheriff's office. The appellant pressed the employee to admit that he was stealing and to pay it back, but the employee refused to do so and said that he would rather go to jail. The appellant in his conversation kept referring to jail, getting mugged and getting a record. When the employee continued to deny any theft, the appel-

lant went to a telephone and this time said that it would not be necessary for the police to come out. He then told the employee to straighten up and watch himself.

We conclude that all six incidents tend to show that it was the common practice of the defendant to extort money from employees he had accused of stealing by threatening criminal prosecution. In fact, the evidence clearly demonstrates defendant's common plan and scheme to extract moneys (in which he had a substantial pecuniary interest) from employees caught or accused of stealing from their employers by threats of prosecution and promises of freedom if the employees made restitution, and in most cases to extract arbitrary amounts far in excess of the amounts which the employees admitted taking. Thus, we also conclude that the evidence is plainly relevant and properly admitted, for it tended to show criminal methods and purposes similar to the offenses charged in the indictment (*People* v. *Tarantino, supra,* 45 Cal.2d 590), and that they were all part of a common scheme and plan (*People* v. *Francisco, supra,* 112 Cal.App. 442). Appellant's arguments to the contrary are mainly concerned with conflicts in the evidence, which were apparently resolved against him by the jury.

2. Appellant's contention that he was improperly precluded by the trial court from offering evidence which would have shown his *modus operandi* is without merit, primarily because it is impossible to ascertain from the record exactly what he intended to prove. The record merely indicates that he called a witness, Wayne Swart, to the stand to testify. After the witness was sworn there was an unreported discussion between the court and counsel at the bench, and at the conclusion of this discussion the following transpired:

"MR. BELLI: All right, Mr. Swart, we won't have to call you. Thank you very much.

"Now, we have—

"THE COURT: And, of course, Mr. Belli, if the other witnesses are of the same type.

"MR. BELLI: Same area, yes.

"THE COURT: The ruling would be the same. You may make your offer of proof later.

"MR. BELLI: So, we have a Mel Smith out there, a ranch milk driver, we could let him go; and, I think we also have Barbara Thomas, we could let her go; and we have a gentleman, now the manager of the El Mirador, we can let him go. We have had Nancy McGee, so, let's go back then to Mr. Asta.

Can you remember those names, Mr. Bailiff?'' Thus, although invited by the court to do so, appellant not only neglected to make an offer of proof as to the nature of the testimony he wished to offer, but he also failed to demonstrate for the record its relevance to the issues of the case. Under these circumstances, he is precluded from receiving consideration of the alleged error on appeal (*People* v. *Jones,* 177 Cal.App.2d 420 [2 Cal.Rptr. 305]; Witkin, Cal. Evidence (2d ed. 1966) § 1310, p. 1211). As stated in *People* v. *Jones,* at page 425 of the court's opinion: ''Counsel's offer of proof must fully and clearly state 'the fact which counsel desires to prove and the manner and evidence by which he proposes to prove it. . . .' ''

Appellant argues, however, that although an offer of proof was not made, the record contains a sufficient showing of what was intended. He refers to the colloquy between the court and his counsel during appellant's cross-examination by the prosecutor. The prosecutor had questioned appellant as to whether a Pat Kling was one of the shoppers who discovered a violation at the Ranch Milk Company, and after his counsel objected the following occurred:

''MR. BELLI:—I think, again we are into another collateral. I had a flock of witnesses outside to go into other companies and we thought it was irrelevant at that time, and for the sake of time.

''THE COURT: No. I don't think so, as I understand the law, Mr. Belli, the Prosecution is privileged to show similar offenses.

''MR. BELLI: Or alleged offenses.

''THE COURT: Or alleged offenses. But the Defense may not then counter with the type of evidence that you offered. So, I will overrule your objection.''

We are mindful of the exceptions to the general rule that no offer of proof is required where the record clearly indicates the nature of the evidence which would have been offered, or where the trial judge expressly limits the issues or plainly indicates that he will not receive evidence on a certain subject (*People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706]; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741]). However, as we have already observed, the record in this case is not clear and it does not appear in what manner or to what extent the trial judge may have limited the appellant's evidence. At the very best appellant asks us to speculate from innuendos arising from a discussion between the

court and his counsel which occurred long after he had called the witness Wayne Swart, as to whether this witness and other witnesses would have testified that on other occasions appellant had interviewed other accused thieves without threatening them with criminal prosecution when they refused to pay back the money.

In any event, we are not even convinced that this evidence would have been relevant to the issues of the case and thus admissible. In other words, the mere fact that the prosecution introduced evidence of other offenses similar to those charged in the indictment in order to show plan, scheme and design, does not open the door to the introduction of evidence that there were occasions when the appellant interviewed persons accused of stealing from their employers without threatening them with criminal prosecution. This is so for the mere fact that appellant did not on all occasions resort to illegal tactics in order to collect money from people accused of stealing does not logically or by logical inference tend to prove that it was not his plan, purpose, motive or design to do so when the opportunity afforded itself.

The case of *People* v. *Zerillo,* 36 Cal.2d 222 [223 P.2d 223], is distinguishable. In that case the court simply held that when evidence of other crimes or acts has been admitted for some purpose, the accused should be allowed to explain or deny the transaction. It does not stand for the proposition urged by appellant.

3. Appellant's third claim of error is that the court improperly refused to allow him to call two witnesses, both of whom were members of the district attorney's staff. The record, however, simply indicates that these witnesses were not called by appellant because the court refused to agree in advance that he could cross-examine the witnesses or impeach them if their testimony turned out to be unfavorable as he apparently anticipated. Specifically, after the district attorney had concluded his rebuttal testimony, appellant's counsel (out of the presence of the jury) informed the trial judge that he wished to call two witnesses from the office of the district attorney to inquire into their motives and into the instructions which they gave to Mr. Rancourt, the owner of Carmichael Honda Company, and to his employee, Billy Hilton, allegedly on the issue of whether the attempted extortion of Hilton originated in their minds or in the mind of appellant. The prosecutor then objected on the ground that this testimony was surrebuttal; during the ensuing discussion

appellant's counsel had made it crystal clear that he did not wish to call the witnesses unless he was permitted to ask leading questions and to impeach them if their testimony was not as he hoped for.

We are not aware of any rule which entitled the appellant at the time of his trial to ask leading questions of, or to cross-examine, his own witness (although hostile) on direct examination as a matter of absolute right.[1] To the contrary, with the exception of a witness called under section 2055 of the Code of Civil Procedure (admittedly the witness in the instant case was not called under this section), whether leading questions would be permitted rested solely within the sound discretion of the trial judge.[2] Thus, the court was not required to assure appellant in advance that he would be permitted to ask leading questions, and since he chose not to call the witnesses and thereby demonstrate for the record that the interests of justice were thwarted by the court's refusal to accede to his request, he utterly failed to demonstrate that it abused its discretion.

Furthermore, at the time of the appellant's trial, a party's right to impeach his own witness was limited to prior contradictory statements, and then only if the witness testified adversely and if he was taken by surprise (*People* v. *Creeks*, 141 Cal. 529 [75 P. 101]; *People* v. *Williams*, 104 Cal.App.2d 323 [231 P.2d 544]; *People* v. *Spinosa*, 115 Cal.App.2d 659 [252 P.2d 409]; *Sandoval* v. *Southern Cal. Enterprises, Inc.*, 98 Cal.App.2d 240 [219 P.2d 928]). Consequently, the appellant's contention, that the trial court erred in refusing to assure his counsel that he could impeach the witnesses if their testimony turned out to be unfavorable, is entirely untenable. First, he can hardly claim surprise when his counsel indicated in advance that he anticipated that their testimony would not be as hoped for. As we have stated, to impeach by prior contradictory statements the party calling the witness must have been taken by surprise; thus, the testimony was required to be at variance with what the offering party had good

---

[1]Appellant's trial was concluded in December 1966 prior to the effective date of the Evidence Code. Thus, under § 12 of the Evid. Code we are required to consider appellant's contention on this point according to the statutory and decisional law in effect at that time.

[2]Code Civ. Proc., § 2046 (now covered by § 767 of the Evid. Code) read as follows: "A question which suggests to the witness the answer which the examining party desires, is denominated a leading or suggestive question. On a direct examination, leading questions are not allowed, except in the sound discretion of the court, under special circumstances, making it appear that the interests of justice require it."

reason to believe (*Agalianos* v. *American Central Ins. Co.*, 62 Cal.App. 349 [217 P. 107]). Second, since appellant did not call the witnesses, there is no way of knowing whether they would have given adverse or damaging testimony. As we have already indicated, even the failure of a witness to testify favorably or as "hopefully expected" would not have been enough. Finally, since the witnesses did not testify, there is no way of ascertaining whether their testimony would have conflicted with previous statements (if any) made by these witnesses.

In any event, appellant's counsel's earlier statements contradict his present claim of prejudice. Although he now asserts that the jury was entitled to know just what instructions the witnesses had given Rancourt and Hilton, during his discussion of the problem with the court his counsel had this to say: "Well, technically, I can do a lot better by inferring. I wouldn't put him on in a thousand years in my direct case, and I tried to put him on on surrebuttal.

". . . . . . . . . . . . .

"It's about even-Steven, or part of Steven being even is the observance." And, when the court asked appellant if he really expected the prosecution to call either of these witnesses he stated: "Well, he's in a hell of a position if he doesn't put them on. The jury is going to do a lot of inferring. So, it's one way or the other. That's why I took about ten minutes to determine whether I wanted to put him on or whether I'd rather have it left in the position of where it was. And Mother Machree was shot. That's the technical situation that Counsel is put in every day. That's the only thing I can say. I knew if I put him on I'd have to vouch for his truth and integrity and I wasn't willing to do that."

## II—INSUFFICIENCY OF THE EVIDENCE

We shall consider appellant's arguments that the evidence was insufficient as to counts 1, 4 and 6, while bearing in mind that the test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there is substantial evidence to support the trier of the fact (*People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911] (cert. den., 346 U.S. 827 [98 L.Ed. 352, 74 S.Ct. 47]); *People* v. *Robillard*, 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086] (cert.den. 365 U.S. 866 [6 L.Ed.2d 199, 81 S.Ct. 1043])). As the court stated in *People* v. *Hillery*, 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]: ■ "Moreover, 'It is the trier

of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ██ If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' "

██ Appellant does not dispute the proposition that it is possible to commit the crime of attempted extortion even though the victim is not placed in fear by virtue of the fact that he is cooperating with the police (*People* v. *Lavine*, 115 Cal.App. 289 [1 P.2d 496]; *People* v. *Franquelin*, 109 Cal. App.2d 777 [241 P.2d 651]; *People* v. *Robinson*, 130 Cal.App. 664 [20 P.2d 369]). In *People* v. *Lavine*, *supra* (cited with approval by the Supreme Court in *People* v. *Rojas*, 55 Cal.2d 252 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252]) the court, in rejecting the argument that the crime of attempted extortion could not be committed where the attempt could not possibly succeed, held that the essential elements of attempted extortion are (1) the intent to commit the crime, and (2) a direct ineffectual act done toward its commission.[3] And, as the appellate court more recently stated in *People* v. *Meyers*, 213 Cal.App.2d 518, 523 [28 Cal.Rptr. 753]: "The courts of this state have not concerned themselves with the niceties of distinction between physical and legal impossibility, but have focused their attention on the question of the specific intent to commit the substantive offense." Thus appellant concedes that if he intended by wrongful use of force or fear to obtain money or property from Billy Hilton, the crime of attempted extortion was completed despite the fact that Hilton, unknown to appellant, could not be put in fear because he was an undercover agent for the police. Consequently, the main thrust of his argument as to count 1 is that the defense of entrapment was established as a matter of law.

We do not agree with appellant's contention. "The defense of entrapment is available where the crime was not contemplated by the defendant, but was actually planned and instigated by police officers, and the defendant was by persuasion or fraud lured into its commission." (Witkin, Cal. Crimes (1963) § 174, p. 165.) However, where the intent to commit the crime originates with the defendant and he is not invei-

[3]The court gave CALJIC 101 which reads, in part, as follows:
"An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. . . ."
The court also gave CALJIC 71, 72-A and 73.

gled by the police into its commission, there is no entrapment even though the police afforded the opportunity by the use of decoys (*People* v. *Lindsey,* 91 Cal.App.2d 914 [205 P.2d 1114] ; *People* v. *Makovsky,* 3 Cal.2d 366 [44 P.2d 536] ; *People* v. *Monteverde,* 236 Cal.App.2d 630 [46 Cal.Rptr. 206]). Thus, we conclude that not only did appellant fail to establish the defense of entrapment as a matter of law, but there was also substantial evidence to support the jury's determination against him on this issue.[4] In fact, the testimony of the witnesses Rancourt and Hilton amply establishes the existence of the necessary elements of the crime of extortion,[5] and clearly indicates that the intent to commit the crime originated with the appellant and not with the district attorney or police, viz., the district attorney once contacted by Rancourt merely afforded the opportunity and furnished the decoys, but the intent to extort money from Hilton originated in the mind of appellant and not through suggestions or persuasive tactics employed by the decoys.

Appellant's only attack on the sufficiency of the evidence with relation to count 4 is that there is no evidence that the alleged victim, Jackson B. Stevens was placed in the "position by appellant of having the choice of paying money or being accused of a crime in the sense of being prosecuted."

---

[4]"Entrapment" is a postive defense, imposing upon the accused the burden of showing by a preponderance of the evidence that he was enticed to commit the act for which he is on trial (*People* v. *Valverde,* 246 Cal. App.2d 318 [54 Cal.Rptr. 528]).

[5]In *People* v. *Goodman,* 159 Cal.App.2d 54, 61 [323 P.2d 536], the court defined the crime of extortion as follows: "Extortion is the obtaining of property from another, with his consent, induced by a wrongful use of force, or fear, or under color of official right. (Pen. Code, § 518.) Fear, such as will constitute extortion, may be induced by a threat either to do an unlawful injury to the person of the individual threatened, or to accuse him of any crime, or to expose or to impute to him any disgrace or crime. (Pen. Code, § 519.) Every person who attempts, by means of any threat, such as is specified in section 519, to extort money or other property from another is guilty of a public offense. (Pen. Code, § 524.) "Extortion and theft are not the same offense. To constitute extortion the victim must consent, albeit it is a coerced and unwilling consent, to surrender of his property; the wrongful use of force or fear must be the operating or controlling cause compelling the victim's consent to surrender the thing to the extortionist. (21 Cal.Jur.2d 595, §§ 4, 8.) There are two elements to the crime of attempted extortion—specific intent to commit the crime, and a direct ineffectual act toward its commission." See also *People* v. *Beggs,* 178 Cal. 79 [172 P. 152], wherein the court, after a thorough review of the law, concluded that to threaten a thief with arrest or prosecution unless he made restitution is extortion when by reason of the fear induced by such threats that individual makes the payment demanded.

His sole contention in support of his attack upon the sufficiency of the evidence to sustain count 6 is predicated on the assertion that there is no evidence which shows that the appellant told the alleged victim, Edward Thomas, that he would be accused of theft unless he paid over money.

Once again we conclude that there was substantial evidence for the jury to believe that appellant, in following his preconceived plan or scheme to extract money in arbitrary amounts from employees accused of stealing by the use of fear tactics, and threat of jail or prosecution, was successful in extracting money from both victims in sums exceeding the amounts which they admitted taking. Significantly, when Stevens objected to the amount appellant calculated he had taken, appellant threatened, ''All right, we'll go to the District Attorney's office. I'll call the District Attorney for that—that amount or more.'' And then added, ''Well, if you don't pay this amount you will be reported to the District Attorney or the Sheriff's Office.'' Significantly also, he did not indicate that Thomas would be permitted to go free until he had received assurance from his father that payment would be made. Thus, in asserting that Stevens was not placed in the position of having the choice of paying money or being accused of a crime in the sense of prosecution, and that there is no evidence that appellant told Edward Thomas that he would be accused of theft unless he paid money over, appellant is simply quarreling with semantics. As stated in *People v. Oppenheimer*, 209 Cal.App.2d 413, 422 [26 Cal.Rptr. 18] (cert.den. 375 U.S. 975 [11 L.Ed.2d 421, 84 S.Ct. 494]) : ''An experienced extortionist does not find it necessary to designate specifically what he intends to do as a means of terrifying his prey. (*People v. Goldstein*, 84 Cal.App.2d 581 [191 P.2d 102].) It was appropriately stated in *People v. Sanders*, 188 Cal. 744, 749 [207 P. 380], that '[t]he more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of failure to accomplish his extortion and of a prosecution for his attempted crime.' (*People v. Bolanos*, 49 Cal.App.2d 308 [121 P.2d 753].)

'' 'No precise words are necessary to convey a threat. Conduct takes its legal color and quality more or less from the circumstances surrounding it.' (*Bush v. State*, 19 Ariz. 195 [168 P. 508, 510]. See also *People v. Camodeca*, 52 Cal.2d 142,

148 [338 P.2d 903] ; *People* v. *Peppercorn,* 34 Cal.App.2d 603, 606 [94 P.2d 80].) ''

### III—Jury Instructions

Appellant's first complaint in support of his charge that the court committed prejudicial error in giving and refusing to give certain instructions to the jury is that the court improperly refused to give three of his proffered special instructions regarding the nature and characteristics of the crime of extortion. The record, however, indicates that the court thoroughly and adequately instructed the jury on each and every element of the crime, and that the offered instructions were mainly repetitive.[6] Thus, appellant cannot prevail on this point, for although the trial judge is required to give instructions on all principles of law for the jury's understanding of the case, he may refuse the defendant's proposed instructions which are mere repetitions (*People* v. *Parchen,* 37 Cal.App.2d 215 [98 P.2d 1045]).

Appellant next complains that it was error for the court to give the following instruction: ''It is not a defense to a charge of extortion that the defendant believed he was entitled, or actually was entitled to the money, if any, obtained by him; or that the person whom the defendant threatened to accuse of a crime, if he did so threaten, was or was not guilty of the crime; or that the defendant believed or suspected or knew that the person whom he threatened to accuse of a crime, if he did so threaten, was guilty of that crime; or that the person whom the defendant threatened, to have arrested, if he did so threaten, was or was not guilty of a crime for which he might lawfully have been arrested.'' (CALJIC 276, modified.) He asserts that the instruction was erroneous because it created the impression for the jury that the mere demand for restitution by those from whom money had been stolen is unlawful.

We are not convinced by this argument either. The instruction, in stating what does not constitute a defense to a charge of extortion, makes it reasonably clear that it is referring to a situation in which the other essential elements necessary for the commission of the crime are present. Moreover, any doubt which the jury may have had in this respect should have been

---

[6]The court, in addition to giving three special instructions on the subject, gave the following standard California Criminal Jury Instructions: CALJIC 71, CALJIC 72-A, CALJIC 73, CALJIC 75, CALJIC 76, CALJIC 270, CALJIC 274 (modified), CALJIC 274-A, CALJIC 275, CALJIC 276 (modified), CALJIC 277 and CALJIC 290-A (modified).

dispelled when the instruction was considered in the light of all other instructions which the court gave defining the crime of extortion and the requisite elements.[7] In this respect, the court also instructed the jury that they were to regard each instruction in the light of all others.[8] It also gave CALJIC 274-A which reads in part as follows:

". . . A threat by a person to do that which he has an absolute, legal right to do is not a threat to do an unlawful injury."

Appellant's third complaint is that the court erred in refusing to give the following instruction: "You are instructed that whether Sam J. Asta had or did not have a license or was operating under someone else's license has no bearing on the issues in this case." Appellant points out that he requested this instruction because the evidence disclosed that he was not a licensed investigator, and during his cross-examination the prosecutor had inquired about the licences of the various parties appellant had worked under and about the status of his own license. He concludes that since there is nothing in the law of extortion which makes appellant's possession of a license relevant, the inquiry could only tend to create an inference prejudicial to the appellant. On the other hand, the respondent asserts that the questions were proper because appellant's counsel on direct examination had gone into appellant's background as a private investigator. Thus, respondent contends that the instruction was not required.

We do not find it necessary to determine whether the testimony on licensing was relevant as contended by respondent, because in any event we conclude that the court's failure to give the instruction requested by appellant was not prejudicial. As we have stated, the court adequately instructed the jury on all elements of the crimes of extortion and attempted extortion. There was not the slightest suggestion in these instructions or in the prosecutor's argument on the elements of the offenses that the fact that the appellant did not have a license was an element of any of the offenses with which he was charged.

Appellant's remaining complaints deal with count 1 of the indictment, i.e., the attempted extortion of Billy Hilton. First, he asserts that the court improperly gave an instruction on the defense of entrapment, because there was no evidence that law enforcement officers were informed that appellant

---

[7] See Footnote 4.

[8] The court gave CALJIC 5.

intended to commit any crime, and further there was no evidence that he intended to engage in any activity, whether criminal or otherwise, at the Carmichael Honda Company where Billy Hilton was employed. This instruction read as follows: ''When law-enforcement officers are informed that a person intends to commit a crime, the law permits the officers to afford the opportunity for the commission of the offense, and to lend the apparent cooperation of themselves or of a third person for the purpose of detecting the offender. When officers do this, if the suspect himself, originally and independently of the officers, intends to commit the acts constituting a crime, he is guilty of the crime committed. He has no defense in the fact that an officer or other person engaged in detecting crime was present and provided the opportunity, or aided or encouraged the commission of the offense.'' (BAJI 852 [Rev.])

There was ample evidence that, prior to the time that Mr. Rancourt contacted the district attorney's office with the complaint that he was experiencing shortages of funds at his place of business at the Carmichael Honda Company, the appellant had been engaged in numerous acts of extortion in the conduct of his fidelity shopping service. Thus, from this evidence and from the testimony of Mr. Rancourt there was substantial evidence from which the jury could properly infer that law enforcement officers were armed with information that the defendant had committed acts of extortion and intended to continue with his criminal activity if the opportunity arose. Hence, the instruction was properly given and the fact that the law enforcement officers did not actually know that appellant intended to commit the crime at the Carmichael Honda Company itself is of no consequence. Appellant is merely quarreling with the proposition that law enforcement officers may afford a suspect with the opportunity to commit a crime and may use decoys for this purpose without being guilty of entrapment, as long as they do not actually implant the intent to commit the crime in the perpetrator's mind or inveigle him into doing so.

Second, appellant asserts that the court erred in instructing the jury: ''In considering the defense of entrapment the important question for you to determine is this: Did the defendant conceive the idea of committing the crime of extortion himself or was the idea conceived by another and suggested to the defendant for the purpose of inducing him to commit the crime in order to entrap him and cause his arrest?'' (CALJIC 854 [Rev.].) And, in failing to give a

special instruction which he requested which read as follows: ''In connection with the instructions previously given you on the law of entrapment, you are further instructed that this defense is available as to each and every essential element of any crime charged or alleged in the Indictment. That is, if, as to any essential element of an offense charged, that element had its origin or inception in the conduct of police officers or those acting on behalf of police officers, then the defendant may not be found guilty of the particular crime or offense alleged.''

Appellant argues that the instruction which the court gave is in conflict with the rules established in *People* v. *Perez*, 62 Cal.2d 769 [44 Cal.Rptr. 326, 401 P.2d 934], in that it fails to inform the jury that entrapment runs to all elements of the offense. Accordingly, he concludes that the court not only erred in giving the instruction, but compounded the error by refusing to give the instruction which he requested. Appellant, however, ignores another instruction which the court gave, and hence his argument is totally without merit. This instruction read as follows: ''In connection with the defense of entrapment, as to the essentials of which you have been previously instructed, you are further advised that a defendant, by asserting this defense, does not, in any way, admit guilt as to the offense charged. That is, a defendant may properly deny that he committed all of the essential elements of the offense charged, while contending that such conduct as he did engage in, or such acts as he did perform, were performed in the instigation or urging of police officers or those acting on their behalf and that he was, therefore, after such conduct or acts, entrapped. *If, therefore, you find that, as to any ingredient or element of the offense charged, this ingredient or element was the result of entrapment, then you are to find the defendant not guilty of the offense charged.*'' (Italics added.)

### IV—MISCONDUCT

■ It is well settled, requiring no citation of authority, that misconduct of a prosecutor in a criminal trial may consist of improper remarks in the opening statement, improper examination or cross-examination, or improper argument. However, the term ''misconduct'' implies a dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods (*People* v. *Green*, 236 Cal.App.2d 1 [45 Cal.Rptr. 744]; *People* v. *Baker*, 207 Cal.

App.2d 717 [24 Cal.Rptr. 691]). Thus, it has also been held that a mere mistake relative to the admissibility of proffered evidence is not misconduct in the absence of a showing that the prosecutor was not acting in good faith (*People* v. *Raucho*, 8 Cal.App.2d 655 [47 P.2d 1108]; *People* v. *Hillery*, 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382]). Moreover, with two exceptions, the burden is on the defendant who claims that the prosecutor was guilty of misconduct to object and to seek a curative admonition. Hence, if he is silent or merely objects or makes the assignment of misconduct but does not request an admonition, he cannot complain on appeal (Witkin, Cal. Criminal Procedure (1963) § 748, p. 722). One exception is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict; and the other is where the act done or the remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court (*People* v. *Lyons*, 50 Cal.2d 245 [324 P.2d 556]). Accordingly, we will consider appellant's charges that the prosecutor was guilty of prejudicial misconduct in several instances during his cross-examination of appellant, and at several points during his argument to the jury.

 Appellant complains that the prosecutor was guilty of misconduct in several instances during his cross-examination of appellant because he premised his questions with recitations of what other witnesses had allegedly testified to. This complaint, however, is not only without merit, but it is also picayune. First, there is no indication that the prosecutor, in so phrasing his questions, was misstating the testimony. Thus, although it is true that the form of the prosecutor's questions was objectionable, it does not appear that his conduct was dishonest or reprehensible. Second, in some instances no objections to the questions were made by appellant; in others objections were made and sustained; and in still others the questions were rephrased after appellant objected. Finally, appellant made no assignment of misconduct, nor did he request an admonition. Consequently, even if it is assumed that the prosecutor's conduct amounts to misconduct, it was not of the nature which could not have been cured by an appropriate admonition.

Appellant's remaining charges of misconduct are concerned with the remarks made by the prosecutor during argument to the jury. His first complaint is that the prosecutor stated to

the jury that evidence of other offenses would not have been admitted by the trial judge unless it had probative value. Appellant correctly asserts that in ruling on the admissibility of evidence the court does not weigh the evidence or determine its probative value. Hence, any statement to the jury which suggests that the court has done so in a specific instance is improper. However, when the prosecutor's statement is read in its entirety it does not appear likely that he intentionally attempted to mislead the jury. Rather, it appears more likely that he was attempting to explain why evidence of other offenses was permitted by the court; and that in doing so gave the wrong impression. In any event, appellant failed to object or to request an admonition, and clearly this impropriety could have been cured by an appropriate admonition. Furthermore, in his instructions to the jury the trial judge correctly instructed the jury as to why evidence of other crimes was admitted. The court also instructed the jury that they and not the court were the exclusive judges of the effect and value of the evidence, and that in evaluating the evidence they were not to be concerned with the court's rulings. Thus, any harm which may have resulted from the prosecutor's remarks was undoubtedly cured by the court's instructions.

Appellant next complains that the prosecutor, having successfully prevented the appellant from calling witnesses to show what other reputable companies in the fidelity shopping business did, then proceeded to argue that appellant's counsel did not call these witnesses because they would have "shot him down." In this connection, the following transpired:

"MR. GARCIA: . . . . . . . . .

"Keep in mind through most of the statements Mr. Belli made throughout the trial, including his opening statement, that he hasn't proved any of these things. There is no evidence of these things that he talked about on the opening day of the trial, when he told you that three out of five clerks in Sacramento County are stealing from their employers, and he said he was going to prove that to you. He talked about that two or three times during the trial. Where is his proof? He told you that big business companies do this type of business Asta does, like M&M, I think he talked about, and others. Why didn't he call them in to prove that they were operating the way Asta, we have proved, has been operating? Because they would have shot him down. Because—

"MR. BELLI: Just a minute, just a minute. These are reputa-

ble businessmen, and he is going outside the scope of the record. There were a number of witnesses here. That is outside the record. We couldn't go into that.''

We are inclined toward the view that the testimony referred to by Mr. Garcia was irrelevant to the issues of this case, and therefore objectionable. Hence, we are also inclined to conclude that the prosecutor's remarks were improper. However, once again the record does not clearly indicate that the prosecutor was acting in bad faith, and we are reluctant to impute dishonest and reprehensible conduct on an officer of the court in the absence of a clear showing to this effect. In other words, appellant does not call our attention to anything in the record to support his claim that he was blocked by the prosecutor in his effort to produce witnesses to show what other reputable companies in the fidelity shopping service did. If appellant is referring to the *modus operandi* discussion which took place at the bench (as we have stated earlier in this opinion), the conversation was not recorded and it is impossible to ascertain exactly what occurred. On the other hand, when the court concurred with appellant's objection, the prosecutor pointed out that certain statements had been made by appellant's attorney in his opening statement, and that his remarks were directed to showing that appellant had not presented the evidence he originally claimed he would present. This would indicate good faith on his part. The court then requested the prosecutor to avoid the subject and confine. himself to the record, and the prosecutor proceeded no further in this regard. In any event, appellant did not at that time assign the prosecutor's conduct as misconduct, nor did he request the court to admonish the jury. A timely admonition would have cured this impropriety as well.

Appellant's final complaint is that the prosecutor, when referring to appellant's failure to get a confession from the Chinese clerk, stated: ''And I wonder, as you must be wondering, when Asta testified that he is not really making $20,000 a month in recoveries, because there is not always a recovery, is that what he means? That he's subjected someone to an interrogation of this type, with no evidence, couldn't get a confession, or get him to sign a confession; therefore, he got no money from him.'' In this instance, appellant objected and cited the prosecutor for misconduct. The court sustained the objection and ordered the prosecutor to stay within bounds of the evidence, and there was no further discussion on the subject. Once again we conclude that the appellant was

not prejudiced. And, we do not believe that this is a "close case," as appellant contends. To the contrary, the cumulative effect of all of the evidence is convincing, and we are of the opinion that there is no reasonable possibility that any of the alleged acts of misconduct on the part of the prosecutor contributed to appellant's conviction.

The judgment is affirmed.

Stone, J., concurring.

CONLEY, P. J., Concurring and Dissenting:

I concur in the judgment of conviction as to all counts except count 1, but would reverse the judgment as to that count. I will not vote to send a man to prison on such a count, essentially because it is not based upon reality, but rests on a fairy story invented by the law enforcement officers. The police and district attorneys of the state have enough real crime to ferret out for punishment without busying themselves with a theoretical offense founded upon pretense.

Furthermore, an essential element of extortion is missing in count 1. Extortion is the felonious exaction of money or property through the application of force, or the inspiration of fear, by accusing the victim of some wrong of which he is guilty, or as to which he might appear to be guilty, in the eyes of friends, or the public. The crime as defined by the Penal Code requires the "wrongful use of force or fear." (Pen. Code, § 518.) In the instant case, there is no suggestion that force was used so that it is an inescapable deduction that total reliance is placed on fear. But there could not possibly be fear in this case. The pretended victim not only knew that he had not stolen any money from his employer, but what is more important, he also knew that his play-acting was in response to the suggestion and with the cooperation of law enforcement agents and that he could not possibly be prosecuted or convicted for a theoretical crime which had their blessing but no part in reality. Therefore, an essential element of the offense of extortion was absent in that the fear of the pretended victim not only did not exist but could not exist. The authorities support this view: 21 Cal.Jur.2d, Extortion & Blackmail, section 8, pages 595-596; *People* v. *Williams,* 127 Cal. 212 [59 P. 581]; *People* v. *Beggs,* 178 Cal. 79, 88-89 [172 P. 152]; *People* v. *Turner,* 22 Cal.App.2d 186 [70 P.2d 642]; *People* v. *Hopkins,* 105 Cal.App.2d 708 [233 P.2d 948]; *People* v. *Goodman,* 159 Cal.App.2d 54, 61 [323 P.2d 536].

In the absence of a necessary element of a crime there can be no conviction. (*People* v. *Collins*, 53 Cal. 185.) This principle is applicable to count 1. The judgment of conviction on that count should be reversed.